Anthony LaCroix for the appellant and may it please the court. Lawrence Memorial Hospital falsified and destroyed patient records to make it look like chest pain patients coming into the emergency department got to the emergency department later than they actually did. One of the head nurses called this, and I quote, kind of cheating. And it was. LMH's express purpose, repeatedly expressed purpose in this scheme was to maximize Medicare payments. And it did. The record shows that... Does the record indicate how many instances of falsified records? Your Honor, the record indicates that there are several measures, both on the inpatient side and the outpatient side, where anybody who, for which an arrival time was reported, was in fact reported as part of those programs. One of defendant's witnesses has an affidavit in the record, Michael Williams. He was an officer of the submitted. Does the record indicate the actual arrival time? It does not, by the very nature of the scheme, which is to make sure there's no documentation of an earlier event. As noted, they both falsified records after the fact and ensured that there was no actual recording of the arrival time. Because during the abstraction process from the patient records, LMH knew that if there was nothing else to look at, that these later times had to be used as the arrival time. So it was not the case that somebody shows up in the emergency room. So this would be the eye. Somebody shows up in the emergency room and says, I have chest pain. They immediately go get an EKG. That was what Lawrence Memorial Hospital called a straight back jack program. The record shows that that is in fact how chest patients are supposed to be treated in the ER and how Lawrence Memorial Hospital treated them even before this scheme took place. If that's what they did, then the arrival time and the EKG time are the same. The EKG time, by definition, cannot occur until the patient has arrived at the hospital. And what LMH has reported is synonymous times, which is physically impossible. And it's only a result of making sure that previous documentation does not exist in the there's nothing else there to show a different arrival time. Why don't you infer from that that they show up to the emergency room, say I have a chest pain, and they're down to the EKG? That's precisely what's supposed to happen and probably did in many instances. It still cannot be accomplished in less than a minute. It certainly can't be accomplished in a median of zero minutes. Are you talking about just because you have to have time for the patient to either walk down there or be wheeled down there? Right. And not only that, Your Honor, but actually attach the 12 leads of the EKG. They often have to shave somebody's chest. But isn't that part of the process of an EKG, to prep them? It is part of the process. It's not inappropriate to say we started it when we started shaving the chest area, right? That's okay, isn't it? That's all true, but the EKG time the record shows in CMS is set forward is when the EKG machine goes on. But all of that is frankly, Your Honor, it's a clinical matter that does not go to the falsity at its core, which is that LMH insured and had an actual scheme to make sure there were not additional records, as there should have been. There's an expert witness report, Dr. Jeremiah. Why doesn't that bear on the materiality of the information that was falsified under Escobar? Right. Your Honor, there are several categories of evidence that highlight the materiality in this case. As Escobar sets forth, we do have statutory definition, which is a natural tendency to influence or capability to influence the receipt of payment of property. Escobar equates that with its statement that the materiality looks to the effect on the likely or actual payment behavior. Do you have a damage model that shows how much extra money they made by doing this? We do, Your Honor, but damages were not, as we see it, part of the district court's ruling and not part of this appeal. The damages in this case, as we set forth in the footnote and the reply brief, we put our expert report into the record, the damages with respect to the Medicare fraud are in the hundreds of thousands of dollars per year. But that's considering lots of things, probably like punitive damages. No, Your Honor. That's like hard damages, money paid out by the government that shouldn't have been paid out? That's correct, Your Honor, and let me be clear what we're talking about here. The five or six different actual required elements, and we'll give you an extra 2% of Medicare dollars, both on the inpatient side and the outpatient side. So we're not talking about the full amount of the payment for services. That's a 2% at every turn. So if there is a claim, a medical claim for $100, only 98 of those dollars, 98 of those dollars would have been received irrespective of our claims. 2% of that is what's at issue. In addition to that, the hospital value-based purchasing program, which was newer, is only available to hospitals that did not receive that 2% reduction on the inpatient side. It's a sub-program of IQR. So like the actual dollars at issue, that's not something you ever quantified for the district court? We quantified it for the district court when it appeared that the district court had erroneously equated damages with materiality. It is in the record, but I want to be clear that ESCOBAR sets forth and stands for the proposition in numerous other cases, including cases from this court, materiality can't be equated with damages. It can't be equated with reliance or causation. Materiality looks to the likely or the actual effect on the recipient's payment behavior. This court said as much. Why are these records material under that standard? There's a number of reasons, Your Honor, and I want to point specifically to one that I think is particularly telling. In 2013, LMH failed with one of these enumerated requirements to get this 2%. It failed to issue a timely report of hospital-acquired infection data, which holds exactly the same relevance to CMS as the timeliness of other data and the accuracy of the data. CMS's response was immediate, it was unequivocal, and it was automatic. Because LMH had missed that deadline by days, that 2% was automatically imposed. That reduction is not something some decision-maker had to sit on. It's not a process by which there are hearings. If you miss the deadline, you lose the 2%. The record in this case shows that accuracy holds at least the same significance to CMS as timeliness does. And the citation to that letter is page 3296 of the appendix. But in addition to that, Your Honor, we are talking about express conditions of payment. Both Congress and CMS have set forth that this quality data must be accurate. There's even what's called a data accuracy and completeness acknowledgment, where someone has to attest from the hospital that in order to receive this... Let's square that with Escobar's statement about regulatory compliance acts are typically not deemed to be material and it's a fairly rigorous or strict standard. Right. I think there are a couple of statements in Escobar, each of which demonstrate that do not preclude materiality here. Escobar speaks of garden variety breaches. I think it uses an example of staplers. Say there's a requirement that staplers need to be made in the United States. It's probably not material to payment in the objective sense. A reasonable person wouldn't consider it material. With respect to the use of the word rigorous, the reason the Escobar court speaks of a rigorous and demanding standard is because the parties in that case, one came in and said if it's a condition of participation only, it can't be material. And the other came in and said if it's a condition of payment, it must be too bipolar. That is not rigorous enough. As this court noted in the United States versus Williams, a criminal case handed down in August, materiality is a concept that in fact does not require evidence of what the recipient thought or did. This court stated a false statement can be material regardless of its influence on the decision maker. It can also be material even if the decision maker had already arrived at the conclusion before the court also stated, as we have noted, materiality analysis are identical for bank fraud, mail fraud, wire fraud, and false statement offenses. Escobar does not change that in any way with respect to the FCA. Again, there are courts that have seized on the rigorous and demanding language from Escobar, but that language is only to differentiate the claims before the court. Just a minute. Does the record indicate that there was a start time on this practice of starting the clock when the AG starts? When did the scheme begin, Your Honor? Why didn't you call it a scheme? I said this practice. It did. The record indicates that the practice began shortly after hospital value-based purchasing was made public and made known to the hospital. Those are primarily in what are called weekly notes that we've cited throughout our opening brief. Does the record indicate what the timing was between arrival and the EKG before this practice started? It does, Your Honor. We cite to a set of interrogatory responses where prior to the practice, there were no zero, we're talking about a median time, no zero door to EKG times. There were, I believe, 11 quarters in a row after this practice started where LMH had achieved a zero-minute time. They also advertised to the public. Give me a flavor for the gap time from arrival to EKG in the period before this protocol was adopted. Before it, it varied between, I think, 3 and 12 minutes, somewhere in that range, or very nearly so. There were some lower times, but none of them was… Are there, for that period of time before this protocol, are there documents that indicate admission time when they were admitted? They do. Admission is sort of a loaded term in medical documentation. Sometimes it's What about for the emergency room? Is there something comparable to admission? We accept you in here? The typical way that, again, these abstractors find the time that's going to go into these inpatient and outpatient reports is the patient is registered, and they have what's called a QTR, quick trauma… Do the documents indicate at all the gap time between registration and EKG in the emergency room before this protocol was adopted? They indicate what the inpatient quality report shows LMH reported. And again, I'd refer to that interrogatory response, which we've cited in our opening. Where do I find those interrogatory responses? I don't want you… When you're listening to Mr. Lester, find it and give me a cite. I don't want you to use your time. Will do, Your Honor. I'd reserve the remainder. Thank you, counsel. May it please the court, I'm Andy Lester. I'm here on behalf of Lawrence Memorial Hospital. I'm accompanied by my colleague, Mark Cole. Lawrence Memorial Hospital is a non-profit hospital in the university community. And as pretty much all of the cases since Escobar have pointed out, materiality matters. Post-Escobar, we've seen court after court grant motions to dismiss, motions for summary judgment, and even reversed jury verdicts. As Your Honors mentioned, under the False Claims Act, there is both a materiality and a scienter requirement. Both of them are to be rigorously and strictly enforced. I would like to talk briefly about the standard of review. The standard of review… Yes, Judge. Back to that. Is there any evidence that any medical records were destroyed? No. Is there any evidence that there were altered registration documents? No. Is there any evidence that there were discarded triage notes? No. There is evidence that not every piece of paper was kept. Once what's on a piece of paper was inputted into the system, the piece of paper was not necessarily kept. Walk me through this. It just seems strange, having visited hospitals from time to time, that the EKG would start under this protocol at zero time. Help me with that. I assume that's both for inpatient and outpatient. There are a couple of ways that that happened. The first is, if the EKG was administered in the ambulance, that would be a zero. You're on the way to the hospital, you arrive at the hospital, the EKG is already hooked up. That's not an insignificant number of situations in Lawrence. The ambulance service is owned by the hospital? I don't believe so. That's not the hospital doing the EKG. No, but the EKG is already being administered. Here's what happened. As soon as somebody presented at the hospital and said, chest and pain in the same sentence, we stop any registration process, take them back immediately, and hook them up to an EKG. That, as everybody agrees, is good medical practice. How do they get their name to put on the records from the EKG? They would put it on as soon as they had the ability, once they're hooked up. So basically, they're doing EKGs on John and Jane Doe's? Could be, yes. And that's exactly what it is. The first document that shows a time stamp of anything is going to be that EKG. That's what's put down. And here again, that's what is medically indicated. That's what's for the good of the patients. And that's undisputed in this record. How does it occur with inpatients? I think, again, the same thing. I mean, if somebody presents immediately, I mean, they're probably not inpatient, but when somebody presents with chest pain, the idea is to get them hooked up to the EKG to get to the point of making the diagnosis there is an infarction or there is not. There's no inquiry of what's chest pain like, what's it feel like, nothing like that. Chest pain and you're down there, right? Yes. If you've ever presented at a hospital and said chest and pain at the same moment, that's… Is there any evidence that that's a practice in the industry? In fact, it's undisputed. Even the relator testified that this is the best practices to get them back immediately. But, I mean… I don't believe so. So the only evidence about what's going on with these protocols in zero time is from the Lawrence Hospital, not what happens in the industry or other hospitals. That's my recollection, yes. This may be the same question, but there's no evidence in the record of what representative times at other hospitals might be in comparison. I don't recall that. Okay. I don't recall that. Why can't we infer, at least believe that there's a fact question that the practice here influenced the decision or was likely to influence the decision of the government to pay these claims? Well, there's no evidence to that effect. I mean, I guess the evidence would be the fact that there is some rule that… Is the materiality legal or a factual question? Well, it's both. It's both. I do think, well, and this is where I started to talk about the burden of proof. The burden of proof, of course, we… Let's not get into the burden of proof before we finish this subject. Didn't this practice start at the very time the HVBP program started? I'm not positive, Your Honor. Would I be able to figure that out from the record? I think so, and I apologize. If they correspond in time, then that suggests that there was a reason for them to do it, and that is to get more money. Well, I suppose one could jump to that conclusion, but I don't think there's any evidence in the record to support that that's the conclusion. One… You don't think that would be supported by the proposition that there was a… That the protocol started at the very time when the HVBP program started? No. I don't think that would be a reasonable answer. No, I think one can come to all sorts of conclusions based on that, but what… You know, look, here was the entire point. First off is, of course, to get the patients diagnosed as quickly as possible. There's so much evidence in the record to show that this is not material. I mean, the government investigated this. The government interviewed the relator. The government went through all of this. There's ample evidence that the government has looked at this and has never changed its payment practices even through today. Is there any indication that CMS employees that are charged with the decision to pay looked at this thing and didn't do anything about it? Yes, there's evidence that CMS has a contractor. The contractor reviewed it. The evidence is very clear. A contractor who is charged with authorizing payment? The contractor is charged by CMS to go do the investigation. Yes. The investigation on the basis of the claims of the relator. I'm talking about the employees at CMS that make the decision to pay and how much to pay. Is there any evidence that those individuals looked at this and didn't do anything? There's the evidence that they had the entire factual background of this case. The very people who make the decision to pay and how much to pay? Certainly, and it's because, if nothing else, they have the contractor that they have tasked with doing this job for them, and the contractor reported to them. I'm sorry? The contractor who decides whether to pay and how much to pay. The contractor who performs the investigation. When you say that, are you talking about something like an audit? They hear that something might be going on or just as a matter of practice they want to make sure there's nothing going on, and they send a contractor out to review what you're doing to see if there's a problem? Well, there's that. There's the affidavit of Wayne Fisher. It's at page 2530 of the record, of the appendix. This specifically deals with – I don't want to read the affidavit, but they go out and they investigate on behalf of CMS allegations such as the ones made here, allegations of fraud. They look at it. They produce the report. They do that for CMS. CMS reviews it, and CMS did review it. And what we know here, and we know it, it's in the record, is that CMS never changed its payment practices. The United States never entered this case. They had the opportunity to. The United States attorney actually interviewed the relator. That's not dispositive, is it? Because in any QUTEM case, you'd never have a relator pursuing it. It's not dispositive. That's correct. Do you have a case that says that that fact matters at all, that the United States chose not to pursue the case themselves? There's certainly post-Escobar case law that indicates that, and it indicates it because it's important. At some point, if there is a bad practice, the idea is to stop the bad practice. And when the United States gets involved in the case, that would be one pretty clear indication that this is a bad practice. Let me drill down on your investigator. So the investigator you talked to and that you have an affidavit from, that's somebody who there's an allegation of fraud made about Lawrence Memorial Hospital, and presumably specifically this practice, and the government dispatches this investigator to come out and look at it and see if there's any meat there. And so this investigator comes, looks, says no problem, and your position is, look, the investigator's already been here, already looked at it, lest it government continues to pay. I think for the materiality inquiry, which is important here, which is vital here, I mean, materiality really does make the difference, that yes, that is correct. It's not a matter of blessing it. It's a matter of, okay, this is changing the payment practice. That's the inquiry for materiality. So I guess that presumably the government could disagree that what your client was doing was technically right, but they say, you know what, it's not exactly right, but we're going to go ahead and pay them anyway. It's immaterial. It's immaterial, right. We're still going to pay them because it's close enough. Yes. I mean, according to Escobar, and it's at the very beginning of the case, a defendant, the issue is whether a defendant knowingly violates a requirement that the defendant knows is material to the government's payment decision. And that doesn't exist in this case. It was the relator's burden to present that evidence. Has LMH continued the practice? I believe it has, yes. Is Mr. Fisher the actual employed by the contractor who did the audit?  And is the audit documents included in the record? Excuse me. I may have misstated it. I know he's the custodian of the records for the contractor. I'm not sure that he's the person who went out there. He works for the contractor, not for the hospital. Oh, that's correct, yes. And so he's just an authentication and foundation witness in the affidavit to establish the foundation for the document, the underlying audit report. He is presenting the documents, and then the documents are attached to his affidavit, yes. Are there any other audits or any other documents other than the Fisher affidavit and the attachments as to an audit of this practice? Is that the only thing? I'm not saying that's not enough, but is that it? I think there is more, but candidly I can't answer that question. Here's what I do know. They had the burden to show materiality. They didn't. They didn't present any evidence, in fact, that the government would have changed its payment decision based on what their allegations are. It's their burden. It's a rigorous, strict, heavy burden. They didn't do it. This is not an all-purpose anti-fraud statute. Materiality looks to what the likely or actual behavior of the government is. It's what the government would do, not what it maybe could have done, not maybe what it might do, what it could have done, and they didn't do it. So earlier you were going to tell us about this. You wanted to tell us what the standard was for reviewing this and how it fit in. You didn't get your chance, but I'd like to hear it if you would. Well, I think I may have gotten it out sideways. It is, of course, we're on summary judgment, so you have the typical summary judgment standard, but it's also you have to look at the materiality issue, and that includes the definition of materiality, which places that rigorous, demanding, strictly enforced burden on the plaintiffs. It's not a two-fact intensive type of burden. It's something that the plaintiffs could have presented evidence on, but they did not. Does the Fisher affidavit or the documents attached indicate that the audit was generated by the relator's claims? Yes, it does, and it was. Is there anything else in the record as to an audit or something comparable to an audit, independent of the relator's claims? I think there is, but I'm sorry, Your Honor, at the moment I can't locate that. Thank you, Mr. Lester. Your time's up. There's some rebuttal time still for Mr. LaCroix. Your Honor, I do have those citations to the record. Save it to after your time's up and give it to me. Oh, yes, Your Honor. With respect to the notion of government investigation, there is no evidence that CMS gained actual knowledge, the language the Supreme Court used in Escobar, of the false claims. We have set forth here. This company called NCI did not have a decision-making authority, or at least there's nothing in the record suggesting any decision-making authority that it would have for CMS or anyone else with power over funds. NCI investigated the narrow question of whether this door to EKG, which is OP5, was an HVBP measure implicitly. That's because Ms. Duffy, who was the original relator in this case, had witnessed these statements that were focused on this door to EKG measure. Now, I want to emphasize that this scheme did not only impact that door to EKG measure. There are numerous measures cited in the record. LMH has stated that thousands of arrival times on these numerous measures were submitted. But NCI truncated its investigation, focused on the wrong thing, and did not learn what we have presented and learned through discovery, which is these arrival times are important not just to that measure and not just to hospital value-based purchasing, but to all of the inpatient quality measures where arrival time is a data point. How many other elements are there to the, you know, these are a couple of metrics, arrival time, right? What other elements are there to the overall score that permits the payments of the HVBP program? Right. Some of them, Your Honor, are statistics where there's a numerator, denominator, and we come up with a median, something like that. Many of them are not. The entire population of patients who fit a description go into the metric. One example of that is AMI-8. Any patient who was admitted and got angioplasty, CMS is measuring the time from hospital arrival to angioplasty. There's throughput measures. One of those is ED1. Others are outpatient 18, outpatient 20, where CMS is measuring the time it takes to reach certain milestones as the patient progresses. How many other of the metrics employ the arrival time data? I don't have a dispositive number for you there, Your Honor. We have cited in the record in pages 2596, 2600, and 1394 are examples of where we have cited to the various metrics that do involve arrival time and were reported by CMS. Certainly... Is it like 2 of 3 employed arrival time, or is it 2 of 20? I think it's probably, on the inpatient side, it may be 2 or 3 of 18 is the number that sticks out. And on the outpatient side, there are a few more. But CMS has made clear that accuracy is a condition of payment, just as timeliness is. Mr. Kwa, could you give me the cites and the interrogatory answers? Yes, Your Honor. Cited on page 8 of our opening brief... Oh, no, I want to read the record. Yes, Your Honor. Appendix page 3431 in Volume 14 and 3433 in Volume 14, as well as page 948 in Volume 5. In addition, Your Honor, LMH has made clear that the ambulance issue, the notion that a patient may arrive by ambulance, does not explain these zero-minute times. On page 3391 of Volume 14. All right, counsel. I think your time has expired. We appreciate both counsel's willingness to engage on these issues. The case shall be submitted. Counsel will take a recess. Thank you.